## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PACIFIC-OCEAN AUTO PARTS
COMPANY, a California Corporation
d/b/a PAPCO,                                    Case No.

     Plaintiff,                                Hon.

vs.

GENERAL MOTORS COMPANY, a
Delaware corporation,

     Defendant.

_____

## <u>PLAINTIFF'S COMPLAINT</u>

Plaintiff, Pacific-Ocean Auto Parts Company, a California Corporation d/b/a PAPCO ("Plaintiff" or "PAPCO"), by and through its counsel, Butzel Long, a professional corporation, for its Complaint against Defendant, General Motors Company, a Delaware corporation ("Defendant" or "GM"), states as follows:

### THE PARTIES

1.    Plaintiff Pacific-Ocean Auto Parts Company ("PAPCO") is and was, at all times relevant hereto, a California Corporation with its principal place of business in the County of Santa Clara, California.

2.    PAPCO is informed and believes that Defendant General Motors Company ("GM") is and was, at all times relevant hereto, a Delaware corporation

with its principal place of business in Detroit, Michigan.

## JURISDICTION AND VENUE

3.      Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. PAPCO is a California Corporation with its principal place of business in San Jose, California. GM is a Delaware corporation with its principal place of business in Detroit, Michigan. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.      Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 1391 (b)(l) because the sole defendant's principal place of business is located within the Eastern District of Michigan, and because the underlying contract to this action designates the Eastern District of Michigan as the venue of choice.

## FACTS COMMON TO ALL COUNTS

5.      PAPCO has been a distributor of auto parts and accessories for car dealerships since May of 1997. Since January 1, 2015, PAPCO was owned 20 percent by Stacey Duff ("Duff") and 80 percent by Peter Frank ("Frank").

6.      Since as early as January 1, 2015, Duff and Frank set in motion plans to maximize the profit and value of PAPCO through the year 2022, at which time Duff planned to buy out Frank's interest in PAPCO. Duff had worked for PAPCO for 22 years with the intent and understanding that she would eventually purchase Frank's interest and take over the business.

2

7.     In or around 2004, PAPCO became an authorized distributor for GM, selling auto parts and accessories to GM dealerships. GM refers to their distributors as GM Accessories Distributor Installers, or "ADIs." To that end, PAPCO entered into a five-year written ADI contract with GM.

8.     PAPCO's ADI sales territory for GM covered the San Francisco and Sacramento areas in California.  To maintain its ADI status, PAPCO was required to enter into a new ADI contract with GM at the end of each five-year term.

9.     From 2004 to 2009, PAPCO performed well and had a consistently strong sales record, hitting most, if not all, of GM's sales objectives with the exception of one quarter in 2004.

10.     In 2009, GM filed Bankruptcy. As a result, GM's ADI network was cut in half and PAPCO's ADI territory was absorbed by another ADI distributor named "Vehicle Accessory Center."

11.     From 2009 to 2013, PAPCO continued its marketing and distribution business but focused on selling accessories and performance parts for other car manufacturers, such as Ford and Chrysler.

12.     In or around 2013, Vehicle Accessory Center sold the ADI rights it acquired from PAPCO back to PAPCO. GM approved the sale.

13.     On or about October 31, 2015, PAPCO entered into a new five-year ADI Agreement with GM for the period of January 1, 2016 to December 31, 2020

(the "2015 Contract"). Attached hereto as Exhibit A is a true and correct copy of the 2015 Contract between GM and PAPCO.

14.     From 2013 to 2018, PAPCO was a consistent performer for GM, ranking among the middle of the pack across the 25 ADIs for its overall sales performance. PAPCO also demonstrated commendable growth year over year ("YOY"). For example, in 2016, PAPCO ranked number one for highest YOY growth rate (at 57%), and the second highest YOY growth rate in 2017 (at 17%). Further, out of 76 sales territories, PAPCO's San Francisco territory ranked 3rd nationally for largest YOY growth rate, enjoying a 245% growth rate over a five-year period (from 2013 to 2018), and its Sacramento territory ranked 6th nationally, enjoying a 204% YOY growth rate during the same period. (For context, the ADI with the lowest growth rate, Express Dealer Accessories, had a growth rate of 28.32% over the same five-year period. PAPCO is informed and believes, and based thereon alleges that Express Dealer Accessories is still an ADI for GM despite its demonstrably poor performance.)

15.     At some point in time, GM created an Operation Excellence Team that was employed by GM to assist the ADIs to maximize their sales performance.

16.     Although PAPCO consistently performed in the middle of the pack among the other ADIs, PAPCO wanted to maximize its potential. Therefore, in or around 2018, PAPCO requested and GM approved for PAPCO to work with Marty

Smith ("Smith"), a member of GM's Operation Excellence Team, to restructure PAPCO's business and sales team to maximize its performance for GM. As part of Smith's program, he recommended that PAPCO stop distributing for other manufacturers and focus all of its efforts on GM. Smith also recommended that PAPCO completely revamp its sales team by, among other things, implementing a strict and detailed protocol that created an effective and seamless procedure between PAPCO, the zone team and GM. (Zone teams are made up of GM employees who are responsible for vehicle sales in geographic regions by brand, i.e., GMC, Chevrolet, and Cadillac. The ADI's work with the zone teams to create dealer (or zone) specific accessory specials or action plans.) According to Smith, PAPCO's sales team was a bit antiquated and needed to follow a rigorous new protocol to maximize its efficiency and performance.  GM's management was apprised of Smith's restructuring plan for PAPCO, including GM's ADI Director, Chris Maciag ("Maciag"), GM's ADI Network Manager, Chris Baron ("Baron"), GM's ADI District Manager, Leif Settergren ("Settergren"), and Sean Hudson, and they each approved it. It was known by both GM and PAPCO that Smith's plan would take at least a year to implement before PAPCO would see the beneficial effects of it.

17.    PAPCO followed Smith's recommendations closely, and by August 2018, PAPCO stopped distributing for other car manufacturers and consolidated its operations to sell exclusively for GM.  In addition, per Smith's direction, PAPCO

implemented the new protocols set forth by Smith for its sales team to follow. Smith required PAPCO's sales force to follow this specific process to improve results. For example, for each dealer visit, the PAPCO's sales team was required to conduct and prepare a detailed analysis of each dealer prior to the visit to understand (1) what vehicles the dealership had on their lot and what could be accessorized, (2) what the dealer ordered as limited production option ("LPO") accessories from the factory and what would complement those accessories, and (3) to create a presentation of recommendations for each dealer they visited. Smith also required the sales force to track and report their dealer visits each day to management.  By January or February of 2019, PAPCO's entire sales force had resigned because they did not want to align with the new protocols and requirements implemented by Smith. Although PAPCO began actively recruiting to hire a new sales force as soon as its team members began to quit, finding replacements took time because Smith required PAPCO to use strict criteria to select ideal candidates to be trained by him.

## ADI Sale Objectives Set Pursuant To The Terms Of The 2015 Contract

18.     At the time PAPCO entered into the 2015 Contract with GM, GM set the ADIs' sales objectives according to the guidelines set forth in Article 5.4.3 of the 2015 Contract, which required the sales objectives to be developed at the dealer retail vehicle level. More specifically, Article 5.4.3 requires GM to first set the dealership's sales objectives (i.e., how many cars the dealers were expected to sell),

6

and based upon those numbers, GM would then determine how many accessories and performance parts the ADIs were required to sell per the number of cars the dealers were expected to sell.

19.    Tethering the ADI's sales objectives to the dealers' sales objectives made sense because the ADI's sales performance was entirely dependent upon how many cars the dealers were expected to and did sell. For example, if a dealer only sold 10 cars, the ADI could only sell accessories for those 10 cars sold.

20.    Despite this method being an express term in the 2015 Contract, in or around early 2018, GM informed the ADIs (including PAPCO) that their sales objectives would no longer be determined according to the algorithm GM had used to determine sales objectives at the dealer retail vehicle level, but rather GM would unilaterally set the ADIs' sales objectives at whatever number it saw fit to meet GM's newly set goal to gross $1 billion in accessory sales nationwide. PAPCO is informed and believes, and based thereon alleges that this action was a material breach of Article 5.4.3.

21.    Thereafter, GM began setting PAPCO's (and the other ADIs') sales objectives at goal posts targeted to meet its $1 billion sales goal instead of according to terms set forth in Article 5.4.3. In addition, GM continually increased PAPCO's sales objectives every year to be higher than what it had previously sold, whether or not the market warranted the increase.  As a result, PAPCO's objectives were set

7

higher every year. The problem with this method, however, is that an ADI's performance can eventually hit a plateau if the objectives are not set at the retail level per Article 5.4.3 and based upon the market demands.

22.     For this reason, it was not uncommon or a cause for immediate concern if an ADI failed to meet its sales objectives in a particular quarter, or even in a particular year. GM often set sales objectives just beyond the ADI's reach. If PAPCO performed below GM's satisfaction for at least two quarters in a row, then the 2015 Contract provided that GM was required to review PAPCO, in good faith, for a Process Improvement Program ("PIP"). Further, it was the consistent and uninterrupted course of performance between GM and the ADIs, including PAPCO, for GM to place an underperforming ADI on a PIP for at least one year (or until the ADI's performance improved). If after being placed on a PIP for one year without improvement, then the 2015 Contract provided that GM could, but was not required to, terminate the 2015 Contract for material breach pursuant to Article 11.3 within 60 days.

23.     Plaintiff is informed and believes, and based thereon alleges that there are many ADIs that have been placed on a PIP for several years at a time for underperformance without improvement, and GM has never threatened to terminate their ADI contract. Plaintiff is further informed and believes, and based thereon alleges that GM has never terminated an ADI contract for "underperformance"

without first placing the ADI on a PIP to allow them time to improve. In fact, because of all the factors that can affect and/or influence an ADI's performance (some of which are outside the ADI's control), the 2015 Contract sets forth at least nine different measurements that GM is required to review in good faith when assessing an ADI's overall performance. While GM had some discretion in determining whether PAPCO's performance was "adequate" under the 2015 Contract, that discretion was limited and governed by the implied covenant of good faith and fair dealing to honestly and fairly assess and consider all the agreed upon factors to provide a true assessment of PAPCO's performance before GM could in good faith exercise Article 11.3.

## GM Discriminates Against PAPCO

24.    Although PAPCO performed consistently well over the years, certain management at GM discriminated against PAPCO because Duff (who managed PAPCO) was a woman in an auto industry dominated by men.

25.    Specifically, Baron targeted Duff over the years by ostracizing her during ADI meetings, refusing to cooperate with her when she proposed ideas to help strengthen PAPCO's performance, providing assistance to other ADIs but refusing or limiting the same assistance to PAPCO and behaving like Duff did not exist.

26.    For example, during GM's quarterly meetings with the ADIs, Baron

interacted with each individual ADI except for Duff and refused to acknowledge her during the meetings. Baron also made it a point to call everyone in attendance at the meeting by their name except for Duff. Instead, Baron skipped over Duff and did not address or acknowledge her attendance at all. Moreover, Baron made it a practice to visit his ADIs and made several trips to visit each ADI on the West Coast except for PAPCO. Baron even refused PAPCO permission to work with GM's Continuous Improvement team, yet recommended and even required other ADIs to work with them (after Duff had pitched the idea to Baron). This sort of behavior went on for several years. However, because Baron was not the head director of the ADIs during this time, Baron did not have the power to obstruct PAPCO's performance or terminate PAPCO's 2015 Contract.

27.     In or around June of 2018, PAPCO experienced an all-time record high sales month. PAPCO achieved this result by pushing GM product to all of its dealers toward the end of June. Thus, by the beginning of July 2018, the dealers already had full stock of accessories from the sales that occurred at the end of June. Plus, the Fourth of July holiday fell on a Wednesday so that was one less day PAPCO could generate sales. As a result, PAPCO's sales were slow starting in the beginning of July.

28.     Despite PAPCO's record high sales in June, Baron called Duff on or about July 5th and asked her in a hostile tone, "What the fuck is up with sales?"

29.    Flustered and not sure how to respond to Baron, Duff called Smith to tell him about her conversation with Baron to ask him for advice on how she should respond. Knowing the history of Baron's negative and discriminatory actions against Duff, Smith, on his own accord, caused a Human Resources complaint (the "HR Complaint") to be filed against Baron for being in violation with GM's policies of professional conduct.

30.    Two weeks later, Maciag contacted Duff after reading the HR Complaint and said Baron needed to work on his bedside manner. After Maciag's call, PAPCO did not hear anything further from GM regarding the HR Complaint, or about PAPCO's sales performance in 2018.

31.    However, in or around December of 2018, Maciag retired and Baron was promoted in or around January of 2019 to be the head of the ADI network in Maciag's place. Plaintiff is informed and believes, and based thereon alleges that after Baron became the head of the ADI network, he made it his mission to get rid of Duff because she was a woman, and because Baron held Duff responsible for the HR Complaint.

32.    PAPCO is further informed and believes, and based thereon alleges that, at all times relevant hereto, Baron was acting on behalf of GM, had the authority to act on behalf of GM and GM consented to and/or ratified Baron's conduct.

11

**<u>Baron Retaliates Against Duff</u>**

33.    Almost immediately after Baron was promoted, Baron placed unreasonable demands and expectations on PAPCO from the outset (which Baron knew was during the time PAPCO was in the middle of its restructuring its business and sales team with Smith) to set it up for failure so he could terminate PAPCO's 2015 Contract.

34.    By that time, PAPCO's sales force had resigned as a result of Smith's new protocols and restructuring plan that was approved by GM. Although PAPCO was actively recruiting to hire a new sales team that met Smith's criteria, PAPCO's sales performance dipped temporarily as a result of being without a sales team. Notwithstanding, PAPCO continued to follow Smith's direction. Despite Baron's knowledge of these facts, on or about January 31, 2019, Baron initiated discussions with PAPCO regarding its alleged "under" performance, because PAPCO hit 89% of its sales objective in 2018 and 79% in the beginning of 2019.

35.    For context, in the history that PAPCO served as an ADI, GM never considered these type of sales numbers (i.e., hitting 79% or 89% of sales objective) as grounds for exercising Article 11.3 of the ADI Contract for material breach to terminate the Contract, especially if they only occurred over the course of several months, as for PAPCO. As shown in the chart below, many ADIs performed below 89% (and several below 79%) over the course of a year or longer, yet GM did not

terminate their ADI contracts:

| Year | ADI Name | % Objective | Terminated Contract? |
|---|---|---|---|
| 2016 | Vehicle Accessory Center | 87.60% | No |
| 2017 | Vehicle Accessory Center | 86.74% | No |
| 2019 Q1 | Vehicle Accessory Center | **79.60%** | No |
| 2019 Q2 | Vehicle Accessory Center | 81.97% | No |
| 2018 | Automotive Distributors Warehouse | 86.10% | No |
| 2019 Q1 | Automotive Distributors Warehouse | 88.33% | No |
| 2019 Q2 | Automotive Distributors Warehouse | 89.17% | No |
| 2017 | Vehicle Outfitters | 87.03% | No |
| 2018 | Vehicle Outfitters | **78.03%** | No |
| 2019 Q1 | Vehicle Outfitters | 81.47% | No |
| 2019 Q2 | Vehicle Outfitters | 80.86% | No |
| 2018 | Adrian Steel Company of Maryland | 88.94% | No |
| 2019 Q1 | Adrian Steel Company of Maryland | 84.21% | No |
| 2019 Q2 | Adrian Steel Company of Maryland | 89.75% | No |
| 2018 | Accessory Pros Inc | 88.53% | No |
| 2019 Q1 | Accessory Pros Inc | 86.33% | No |
| 2019 Q2 | Accessory Pros Inc | 89.62% | No |
| 2016 | SouthWest ADI | **79.90%** | No |
| 2017 | SouthWest ADI | 80.47% | No |
| 2018 | SouthWest ADI | 87.42% | No |
| 2019 Q1 | Northwest Accessory Dist., Inc. (NWAD) | **73.00%** | No |

13

| 2019 Q2 | Northwest Accessory Dist., Inc. (NWAD) | **74.52%** | No |
|---|---|---|---|
| 2016 | Southern Vehicle Accessories | 81.55% | No |
| 2017 | Southern Vehicle Accessories | **75.96%** | No |
| 2018 | Southern Vehicle Accessories | 83.80% | No |
| 2019 Q1 | Heartland Area Accessories Inc. | **73.97%** | No |
| 2019 Q2 | Heartland Area Accessories Inc. | 80.84% | No |
| 2016 | Express Dealer Accessories | 89.09% | No |
| 2017 | Express Dealer Accessories | 80.22% | No |
| 2018 | Express Dealer Accessories | 81.55% | No |
| 2018 | Accessories of Chicago | 86.73% | No |
| 2019 Q1 | Accessories of Chicago | 81.63% | No |
| 2019 Q2 | Accessories of Chicago | 86.03% | No |

36.     Moreover, when comparing PAPCO's performance from 2016 to 2019 against other ADIs (as shown below), it becomes clear that 2018 and 2019 were not strong performance years for many ADIs.

| | 2016 | 2017 | 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|
| **ADI Name** | % OF OBJECTIVE | % OF OBJECTIVE | % OF OBJECTIVE | % OF OBJECTIVE | % OF OBJECTIVE |
| Vehicle Outfitters | 97% | 87% | **78%** | 81% | 80% |
| Northwest Accessory Dist., Inc. (NWAD) | 102% | 94% | 92% | **73%** | **74%** |
| **PAPCO** | **100%** | **97%** | **89%** | **79%** | **79%** |
| Accessories of Chicago | 105% | 100% | 86% | 81% | 86% |

14

| | | | | | |
|---|---|---|---|---|---|
| Custom Vehicle Outfitters | 107% | 95% | 92% | 84% | 89% |
| Vehicle Accessory Center | 87% | 86% | 97% | **79%** | 81% |
| Heartland Area Accessories | 97% | 102% | 96% | **73%** | 80% |
| Accessory Pros Inc | 99% | 101% | 88% | 86% | 89% |
| Adrian Steel Company | 98% | 92% | 88% | 84% | 89% |
| Automotive Distributors Warehouse | 96% | 91% | 86% | 88% | 89% |
| **Average** | **99%** | **95%** | **89%** | **81%** | **84%** |

37.     PAPCO, however, is informed and believes, and based thereon alleges that neither GM nor Baron contacted the other ADIs threatening to terminate their ADI contracts for material breach.  Baron only targeted PAPCO—even though he knew PAPCO was restructuring its business and sales force per GM's direction—because he had an agenda to terminate PAPCO's 2015 Contract to get rid of Duff.

38.     On or about April 3, 2019, GM held another conference call with PAPCO. Baron, John Stiller and Settergren were present on behalf of GM and Duff, Frank and Dustin Clark were present on behalf of PAPCO.  Duff led the call to update GM on PAPCO's ongoing progress. She also presented data showing PAPCO's consistent historical performance and strong YOY growth rates to explain to Baron that PAPCO's performance was not failing, but was rebuilding their sales force to become a stronger performer under Smith's direction.   Duff explained that

15

she was working closely with Smith and taking every action possible to rebuild their sales team to increase PAPCO's sales performance quickly.

39.     After Duff finished her presentation to GM, Baron informed her that he was exercising Article 11.3 of the 2015 Contract for material breach and that PAPCO had 60 days to meet their written demands or sell the company, or he would terminate PAPCO's 2015 Contract.

40.     Baron made it clear he was not interested in hearing what PAPCO was doing to improve its performance, he only cared to terminate the 2015 Contract unless PAPCO could meet his unreasonable demands, stating:

> Based on last week's discussion, you must have the following items which must be in place or showed to have made substantial effort toward completing by May 17th:
>
> [1] Fully Staffed Sales Team (1 Sales Manager and *minimum* 4 Territory Sales Managers)
> [2] Training & Development Plan for new sales Team
> [3] Quarterly Business Plan submitted to myself by April 15th, COB (EST)
> [4] Dedicated ADI Inventory Manager / Meeting all current RIM requirements
> [5] Go-To-Market Plan for top 10 Dealers by sales volume
> [6] Zone Team Communication plan maintaining weekly contact
>
> [7] Q2 Sales % vs Objective Average = 95%

41.     Baron's demands were unreasonable for the following reasons: (1) Baron knew PAPCO had lost its entire sales team under GM's direction to revamp

its sales force. Moreover, at the time of Baron's email, the unemployment rate in PAPCO's territory was very low at 2.4%, the market was highly competitive and most candidates would have had to interview in between work schedules and give at least two weeks' notice before leaving their other job—adding to the delay in the hiring process to meet the 30 day deadline.  (2)  Developing a quality Training & Development program takes at least six months to create. (3)  PAPCO had a qualified ADI Inventory Manager and maintained RIM requirements, but because Baron knew PAPCO's Inventory Manger was Duff's brother, Baron used his power to make Duff fire him claiming he had a conflict of interest (when he did not).  And (4) PAPCO could not meet 95% of its sales objectives without a fully staffed, fully trained sales team. Even if PAPCO could have hired four new Territory Sales Managers ("TSMs") to replace its prior sales team by May 17th, it would have taken 60 days to train them under Smith's rigorous training protocol. Assuming PAPCO was successful with that task by June, it would have been impossible to average its quarter's sales at 95% of the objective by that time.

42.    Moreover, many of Baron's demands were not required in the 2015 Contract. For example, there is no express provision under the 2015 Contract requiring (1) a certain number of Sales Managers or TSMs, (2) quarterly business plans, (3) a dedicated ADI Inventory Manager, (4) a Zone Team Communication plan, or (5) a standard to meet 95 percent of sales objectives. For one, 95% is

considered higher than GM's set minimum in 2015 Contract. GM did not require the other ADIs to meet 95% of their sales objectives, and in fact, 85% of the ADIs across the network were hitting substantially less than 95% of their sales objectives. Yet, GM did not threaten to invoke Article 11.3 of their ADI contracts. In addition, Article 11.3 requires GM to consider many more factors than just isolated events before it can find an ADI in material breach of their obligations to terminate the 2015 Contract. Baron failed to consider these other factors before electing to exercise Article 11.3 in bad faith.

43.    Nonetheless, PAPCO worked tirelessly to meet each of Baron's demands within the time period allotted.

44.    Over the next month, PAPCO met each one of Baron's written demands except for: [1] "1 Sales Manager and minimum 4 Territory Sales Managers," and [7] meeting 95 percent of GM's sales objectives for the second quarter. Even though these demands were not set forth as express requirements in the 2015 Contract, Duff made substantial effort toward meeting them. For example, PAPCO still met 79% of its sales objective without a sales team, and it hired two new TSMs by the deadline. Had Baron given PAPCO additional time, PAPCO could have met each of his demands. For example, in July 2019, PAPCO met 103% of its sale objectives and had hired 2 of the 4 TSMs Baron required. However, Baron refused to give PAPCO additional time.

45.     Moreover, PAPCO's performance and inability to meet Baron's demands was a direct result of PAPCO following GM's direction in restructuring its business and revamping its sales force. GM breached the implied covenant of good faith and fair dealing implicit in the 2015 Contract by claiming a material breach for performance that was a direct result of the very restructuring process that GM approved and directed PAPCO to follow prior to Baron taking Maciag's place. GM knew that the restructuring process would take time and would temporarily affect PAPCO's performance.   Yet, Baron still refused to provide PAPCO the adequate time needed for Smith's plan to take effect and used the temporary effects of Smith's plan that as grounds for termination.

46.     Perhaps even more telling, PAPCO was not even GM's worst performer during this time. For example, at the end of the first quarter in 2019, three ADIs (with fully staffed sales teams) finished worse than PAPCO (who had no sales team at the time). At the end of the second quarter, ADI Northwest Accessories Dist., Inc. ("NWAD") (who also had a fully staffed sales team) finished at 74.52% of its sales objective and had $2.5 million less in sales than PAPCO. Moreover, during the 14 month-period leading up to 2019, from November 2017 to December 2018, 11 out of the 26 ADIs failed to hit their sales objectives and performed worse than PAPCO. In fact, ADI Southern Vehicle Accessory never hit their objective one time during that entire period.   Yet, PAPCO is informed and believes, and based

19

thereon alleges that GM did not contact these other ADIs about their performance or threaten to terminate their ADI contracts.  Baron only targeted PAPCO.

47.    Baron also refused to review PAPCO for a PIP, which would have given Duff's team sufficient time to implement Smith's plan and improve its performance. On April 23, 2019, Baron emailed Frank stating, "[B]ased on this and previous discussions regarding PAPCO's performance, the TSM team @ PAPCO, Zone Manager feedback, and a PAPCO Managers conflict of interest working both the ADI and a Dealer, I chose to forego a formal PIP program and proceed to Section 11.3 [] of the current ADI Agreement."

48.    There was no reason to deny PAPCO review for a PIP other than to retaliate against Duff.

49.    Thereafter, on or about May 17, 2019, Duff had a follow up teleconference with GM. At this time, Baron confirmed that GM was exercising Section 11.3 of the ADI Agreement for the following reasons:

> [1] Underperformance / not hitting objective;
>
> [2] Having no TSMs;
>
> [3] PAPCO's inventory manager causing strife between the zone team;
>
> [4] PAPCO's check (to GM) bounced in 2018 when PAPCO changed banks.

Mr. Baron then reaffirmed that if PAPCO did not sell the business within 60 days he

would terminate the ADI Agreement.

50.     After the May 17, 2019 call, Duff telephoned other ADIs who had been performing among the worst in the network to see if GM was taking action against them as well. The ADIs said they had not heard a word from Baron or anyone else at GM regarding their performance.

51.     Given that PAPCO was unable to meet Baron's unreasonable demands within the time allotted, Frank called Baron with no other choice but to plead with him to give PAPCO more time to sell the business. Baron agreed.

## Duff's Proposal To GM To Purchase PAPCO

52.     Given that Duff had planned to purchase PAPCO since 2015, she created a plan to present to GM whereby she would purchase PAPCO with a new partner and bring PAPCO's sales numbers back to the top following Smith's direction.

53.     On or about July 2, 2019, Duff scheduled another teleconference with Baron, Stiller and Settergren from GM. During the call, Duff informed GM that she was submitting an application to purchase PAPCO with a new partner. Baron flatly refused her proposal and said it would be futile to submit an application because he would not review, consider or approve her application or the sale under any circumstances.

54.     When evaluating a proposed change in ownership among existing ADI

owners, the 2015 Contract provides:

> **9.1.1** …The purchasing ADI's historical quarterly performance will be used as evaluation criteria for GM ACCESSORIES [*sic*] review, approval or refusal of proposed purchase agreement.
>
> **9.1.2** …GM ACCESSORIES' written approval is required before such change can be made, GM ACCESSORIES will consider the ADI proposal in accordance with this agreement.
>
> **9.1.6** GM ACCESSORIES is not obligated to approve any proposed changes in management or ownership under this Article unless ADI makes arrangements acceptable to GM ACCESSORIES to satisfy any indebtedness of ADI to GM ACCESSORIES prior to said change or transfer.

55.     At the time of Duff's proposal, PAPCO had no indebtedness to GM.

56.     Although GM had some discretion in reviewing PAPCO's proposed change in ownership, that discretion was limited by the terms and guidelines set forth in the 2015 Contract. The implied covenant of good faith and fair dealing therefore applied to GM's performance in agreeing to consider PAPCO's proposed change in ownership application in accordance with the 2015 Contract and reviewing PAPCO's historical quarterly performance in good faith.  PAPCO is informed and believes, and based thereon alleges that GM exercised its discretion in bad faith for the sole purpose of retaliating against her by refusing to review PAPCO's performance and Duff's application to purchase PAPCO in good faith.

57.     Because GM denied Duff's request to purchase PAPCO, Duff and Frank were forced to sell PAPCO's assets to a third party buyer to prevent a total loss from GM's terminating PAPCO's 2015 Contract (given that PAPCO had consolidated its business to only sell for GM per Smith's recommendations). Not only were Duff and Frank forced to sell prematurely before maximizing the company's value, they were forced to sell during a time that GM was experiencing a strike. As a result of the strike, PAPCO was forced to sell its assets at a significantly lower value than what they were worth, which resulted in a loss to PAPCO totaling at least $5,000,000.

58.     Before closing, PAPCO's performance was already back on the rise with a fully trained sales team performing exceedingly well under Smith's direction and guidance. In fact, Smith informed the new buyers not to mess with PAPCO's sales team and to let Smith do everything according to the plan that PAPCO and Smith had implemented together from the beginning. PAPCO is informed and believes, and based thereon alleges that PAPCO's business is now thriving using the same systems and processes that PAPCO and Smith implemented together before the sale closed.

59.     As a result of the sale, PAPCO no longer has any assets. Duff's life-long plan to purchase PAPCO and take over the business was successfully thwarted by Baron on behalf of GM.

## COUNT I – BREACH OF CONTRACT BY GM

60.     PAPCO incorporates each and every allegation set forth in paragraphs 1 through 59 above as if fully set forth herein.

61.     On or about October 31, 2015, PAPCO entered into the 2015 Contract with GM. The effective date of the 2015 Contract was January 1, 2016.

62.     Implied in the 2015 Contract between PAPCO and GM was a covenant of good faith and fair dealing by which both parties covenanted to refrain from any act that would prevent or impede the others' enjoyment of the fruits and benefits of the 2015 Contract.

63.     PAPCO performed all of its obligations under the 2015 Contract, except those obligations, if any, excused by GM's conduct.

64.     GM materially breached the 2015 Contract by, among other things:

   i.   Failing to develop PAPCO's sales objectives at a dealer retail vehicle level, pursuant to Article 5.4.3;

   ii.  Failing to provide the required training, advice, and counsel to support PAPCO's sales, pursuant to Article 5.10.2;

   iii. Failing to review PAPCO for a PIP program pursuant to Article 6.6;

   iv.  Refusing to review, consider, and approve PAPCO's proposed change in ownership application in accordance with the 2015 Contract, pursuant to Article

9.1.2;

v.  Breaching the covenant of good faith and fair dealing by setting predatorily high sales objectives in bad faith with the intent to cause PAPCO to fail;

vi.  Breaching the covenant of good faith and fair dealing by agreeing to let PAPCO work with Smith to restructure PAPCO's business and sales team, and then mid-process, when PAPCO's sales were temporarily affected by the restructure, exercising Article 11.3 of the 2015 Contract because PAPCO's sales numbers were down as a result of the plan GM recommended;

vii.  Breaching the covenant of good faith and fair dealing by not allowing PAPCO sufficient time for its sales to recover from the effects of GM's own suggestions for improving its performance;

viii.  Breaching the covenant of good faith and fair dealing by claiming PAPCO materially breached the 2015 Contract, and using that purported breach to terminate the 2015 Contract, when GM's instructions were the cause of PAPCO's purported breach;

ix.  Breaching the covenant of good faith and fair dealing by threatening to terminate the 2015 Contract if PAPCO did not meet GM's unreasonable demands that were not required under the 2015 Contract;

x.  Breaching the covenant of good faith and fair dealing by denying PAPCO the opportunity to be placed on a PIP without just cause before threatening to terminate

the 2015 Contract;

    xi.   Breaching the covenant of good faith and fair dealing by abusing its discretion by not fairly assessing PAPCO's overall performance and claiming PAPCO was not performing satisfactorily when in fact it was performing in the middle of the pack, on average, and according to GM's direction no less;

    xii.   Breaching the covenant of good faith and fair dealing by abusing its discretion to force PAPCO to sell its business;

    xiii.   Breaching the covenant of good faith and fair dealing by abusing its discretion in refusing to review PAPCO's application for a proposed for change in ownership;

    xiv.   Breaching the covenant of good faith and fair dealing by abusing its discretion to assess PAPCO's historical performance in bad faith as an excuse to refuse to consider or review PAPCO's application for a proposed change in ownership for Duff to purchase PAPCO with a new partner.

65.   As a direct and proximate result of GM's conduct, PAPCO has suffered damages by the aforementioned breaches in an amount to be ascertained at trial, but in no event less than $5,000,000.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, PAPCO, respectfully requests:

A.  An award of damages, in an amount according to proof, and not less than $5,000,000, exclusive of interest, costs, and other fees;

B.  Costs of suit incurred herein;

C.  Prejudgment interest at the legal rate; and

D.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BUTZEL LONG, a professional corporation**

By: /s/ Donald V. Orlandoni
Donald V. Orlandoni (P71133)
Quendale G. Simmons (P77896)
150 W. Jefferson, Ste. 100
Detroit, MI 48226
(313) 225-7000
orlandoni@butzel.com
simmonsq@butzel.com
Attorneys for Plaintiff

Dated: October 26, 2021

27